I please the court. There are three searches in this case, and on each of them the Kansas City police officers are entitled to qualified immunity. For each search, there is probable cause and an exception to the warrant requirement, and each search turned up illegal contraband drugs. I'll start with each search in order to go through them. For the first search, we believe there was apparent authority that the officers reasonably believed they had to search Suite 201, even if the landlord, the building manager, had said nothing and had merely opened the door in response to being asked to do so during the search of the building. In that case, there would have been a reasonable belief that he had authority to do so. He had been asked by other tenants to show the police around, and it was reasonable, or at least arguable, that he would have had authority to do so as well in that case. Once the door was opened at that point in time, the dangerous chemicals in the lab were apparent and in plain view, and then at that point the plain view exception to the warrant requirement would have taken over and allowed them to enter the lab and secure it to make sure that none of these chemicals were actually going to ignite and pose a danger. So you're saying that in order to examine the first search, we just ignore some of the evidence regarding what the landlord Long purportedly said to the officer and what Riggs said didn't get said to Long? Do we just ignore all that? Well, that's what the plaintiff asked, to take the facts in the light most favorable to the plaintiff. He asks to ignore the conversations related by the police officers that Mr. Long represented he had authority to do so. So we set that aside. Instead, we simply say on the facts alleged by the plaintiff that Mr. Long said nothing about consent. He simply was silent and opened the door as part of the course of investigation. I don't know that that's what Riggs is saying, that it was silent. He's just saying whatever happened, I didn't give him permission. That's just not true. And there was an additional assertion that there was a potentially falsely created consent form. Does that add into the mix in terms of whether or not there was authority to open the door? Does that make it a factual dispute? So there's two questions. Starting with the consent form, let's assume, as he says, that the consent form was not created lawfully and provided no authority. Let's take that as a given. Let's take it as a given, also in response to your first point, that Mr. Riggs did not consent to have the door opened, that in both cases he never told Long, go ahead and do this, and that Long was just acting on his own as a rogue actor, so to speak. That's the factual situation, I'm assuming. Let's set that all aside, because that's what he asked for in taking the facts in the light most favorable, and then setting aside the facts that the officers believe that they'd been invited to do this. And we think that, so in that situation, what you would have had, the record evidence shows that the other tenants asked them to come investigate the burglary that happened. The whole building, yellow powder was everywhere. Other offices had broken glass. The other tenants had called. I mean, in fact, his clerk had called to ask him to investigate his other business in the building, too. So there were police officers all over the building. The building manager starts showing him around upstairs in response to the first tenant, takes him down the hallway. You got this other one. According to Mr. Riggs, the officer, Barbara, would have asked to go in there, and Long says nothing, just unlocks the door and opens it up. In that case, it was reasonable, or at least arguable, that Long implied that he had apparent authority to do so. What about if you accept the assertion that there was a falsified consent form? Does that go to whether or not to believe the officer, as to whether or not that they felt they needed to falsify a consent form later? Does that, when you toss that into the mix, regardless of how it ultimately comes out, does that make it a factual dispute? Well, that would be why you take the facts in light of the most favorable plaintiff, and you set aside anything the officer said. Now, the consent form was filled in later, after the actual search took place. So, in that sense, we're just, you know, let's say it was forged later. Set it aside. What happened at the time when the doors opened, that's the only thing we look at. Well, I guess that's my question. We're not saying the officers, we're not believing a word they said. All we're saying is that the door was opened by Long in response to a request. That's their facts. Well, I guess what I'm saying is, my question, and we can move on to your next search, is I'm just questioning whether an after-the-fact statement that was a falsified, allegedly, purportedly false statement, consent form, I'm sorry, created by the officer involved, does that get into the mix in terms of the credibility of what happened, thus that it's factual? You're saying no. I mean, that's why we're setting aside anything the officer said. We're only looking at the facts accepted by the plaintiff, which is setting aside any agreement to search. We're assuming he had no actual authority to allow this search. And that, I think, is the proper implication if we have to look at the question of actual consent is to assume there was no actual consent. I think that's how the credibility issue plays in. And that's why you look at it strictly as a matter of apparent authority from the building manager at the situation in time. When I read your opening brief, and I could be wrong, I read it to mostly be disputing the fact-finding of the district court. And it wasn't until your reply brief that you were then willing to, I think, apply the appropriate standard, which is to take the plaintiff's facts as alleged and then tell us why it's not a clearly established constitutional right. Am I wrong about that? No, the brief was not written as well as it could have been. I take responsibility for that. Well, doesn't that create a jurisdictional problem for us? Or for you, I should say. Well, on pages 31 to 32, it does refer to, even if you're taking the facts in the light most favorable to the plaintiff, the question is reasonable belief in apparent authority. But that's just a conclusory statement. That's not much argument. We think it's enough to have preserved the issue and clarified it. We also did want to preserve the ability so that we weren't back on remand. They said, well, you abandoned your claim. But we agree it was not written as well. We think if you look at page 31 to 32, we did make the proper argument. And our broader claim that the actions were lawful and protected by qualified immunity, even taking their facts in the light that was put in the brief as a basic claim. If there are no further questions about the first search, I'll move on to the second search. This search was happening at the same time in the same building on the same day, downstairs at the coffee walk, where the counter was searched, the parking garage and other area was searched, where the robber had gone in response to the invitation. The robbery called to the police, where the store clerk had consented. And then later this incense was seized at this time, which turned out to be contraband under state law. We think that this search was lawful because, first, you did have actual consent from the search to come in for the investigation and the search to find them. And then later the plain view exception to the warrant requirement took over when they had probable cause. At what stage? It seems like you have to kind of break that down. You say, and then they had probable cause. Are you suggesting there was probable cause when the, I think it's Officer Toyko, first saw the packets? Or are you talking about probable cause later? I think it's sort of a team investigation, where Toyko and Officer Taylor, both detectives were working at the same time together and doing the search and following the trail. We think that the key point in time is that they had the probable cause before there's any suggestion that the right to search was terminated. So at the time, so when was that? Well, the record doesn't show that Mr. Riggs revoked any consent to search or that the store clerk revoked any consent to search. He declined to seize. According to his version of the facts, he declined to sign a consent form. As to this part, though, he did sign a consent form as to other things. And the right to search, we believe that consent was never revoked. But moreover, the argument they have pressed would also be a situation where if you allow someone to search and then they find something, say, no, no, wait, I revoked my consent so long ago, that would be unreasonable for the police. Maybe I'll reword my question a little bit. Are you saying that there was probable cause at the time that Toygo first saw the incense behind the counter? I think when he combined that with, the district court found when you combine that with the mat-mats, informing them that he had been hired to create an analog. But that's later, right? So when he's standing there and seeing the packets, are you saying there's probable cause right then to seize? Well, the district court didn't make a finding as to that exact point in time. So it's possible that he did when he was examining the packets themselves. The district court said that you had found it when the chemist explained that. And then we also think there would be probable cause because when the lab task force member came and said that he knew that stent incense had been found and most stent incense had been found had tested positive for synthetic marijuana, you certainly had it at that point. But at many points in time you had consent revoked before that point and you also didn't have anything that terminated their lawful right to be there and to collect the incense that had been in the parking garage and other places. I guess I'm curious about whether it was immediately apparent when Toygo first looked at these packets that it was contraband. So the plain view doctrine, do you have to be there lawfully? I think nobody has contested that he was there. He was there to investigate this robbery. But then for plain view to kick in, it has to be immediately apparent that it's contraband. Is your position that Toygo, it was immediately apparent? Because it seemed like he had to go back and get, my understanding of the record is he didn't know whether it was contraband until he got that information from the chemist. I'm wondering how that fits in or whether it matters. I think the record doesn't talk about what's in his mind the exact moment that he sees it at the counter. I think it's unclear because the record speaks to the search of the hole. The officers were adamant as to the search of the hole, which was still ongoing. Before that search concluded, they had probable cause at that time because he had been going up and down from the garage. He called other people to say what had been going on, what he found. So we think because the search was ongoing, it's still immediately apparent during the search that it was in plain view. So when you're saying ongoing, are you considering this all one search? Of the coffee wonk, yes. Even though there are people coming back and forth. Go ahead. Aren't there questions, though, counsel, as to whether the consent was revoked as to the subsequent, well, even if you call it one search, he was there initially for the robbery investigation. There's no question about that. So he was legitimately behind the counter. But he didn't know what the materials were until later. And at that time, wasn't there a dispute as to whether there was consent for further looks behind the counter? We think that taking the record as it is, that it was reasonable to think that the search was still ongoing and that the search itself had not ceased and that consent hadn't been revoked if you look at the record. You had refusal to consent to a seizure, but the district court didn't find that the search had ended before the plain view or the probable cause had been created. So it's a question of timing. It's also a question of the plaintiff's arguments have been very carefully couched in refused consent. Seize, but that's different from refusing consent to search. This consent to search was not revoked. The robbery investigation was ongoing. And in fact, he does not dispute that he'd given consent to search elsewhere. He disputes whether he consented to search this and to the previous suite we talked about. But we think on those facts and setting aside any question of the validity of a written consent to search the coffee block, just setting that aside in total, there still would have been plain view because the search was ongoing at the time when they were still there and seeing the sentence. Ms. Blake, you're into your rebuttal time. Would you like to reserve some? Unless this court would like to discuss the third search right now. You're welcome to continue on. If you'd like. Oh, you simply say on that one that president is clear that you can have a dual purpose search. And if one of the purposes of the administrative searches to find criminal violations and violation of a liquor license, then the law permits that dual search. Very well. Good morning. May it please the court. My name is Henry bell and I represent plaintiff, Michael Riggs. The district court order should be affirmed first and foremost, because this appeal lacks jurisdiction completely. They've. On that situation, we probably wouldn't affirm we'd probably dismiss. Correct. Your honor. I haven't made a motion to miss, but yes, the appeal should be dismissed for lack of jurisdiction. And the reason is because this court has held repeatedly and consistently, consistently. And so is the Supreme court. That interlocutory appeals limited to purely legal questions. And this court cannot reassess factual disputes in the context of an interlocutory appeal. Now there were three searches in each time. The court found that there is a dispute of genuine fact. With respect to each search research to a one, the court found that there's a genuine dispute about what Mr. Long said and did. Hard opening the door council. What relevance does that have to what the officers knew? At the time, this conversation between Mr. Long and Mr. Riggs, they didn't know about that. So what relevance does that have to what they reasonably believed at the time they entered? Yes, your honor. I think it's important to recognize that the defendants have the burden of proof to establish the predicate predicate facts that would establish qualified immunity. The only evidence that they presented as the testimony of officer Barbour and officer Barbour specifically said that. Mr. Long told me that Michael Riggs wanted me to check on suite two Oh one. Well, Mr. Riggs didn't say that to Christopher Long. So it's a reasonable inference that Mr. Long didn't say that to officer Barbour. If he didn't say that to officer Barbour, officer Barbour is lying. And if he's lying, then his overall credibility is called into question. And they simply haven't established the facts that would, that could lead a. Officer to reasonable belief, reasonably believe that Mr. Long had apparent authority. So it really goes down to a credibility issue. And also your honor, you were asking about the forged consent. So they eventually forged Mr. Riggs signature on a consent to suite two Oh one. Well, it's a little bit more complicated than that. He, he signed one search, which he believed was for wonk exchange down the street. But later the officers added suite two Oh one to the, the form that he actually did sign. And if the officers had. Apparent authority to actually search suite two Oh one, why would they go to such lengths? Literally forging his signature to get a consent, the search on suite two Oh one. So basically there's a credibility issue and the court decided that it's unclear what happened prior to the opening of the door. So I'm not suggesting that Mr. Long didn't say anything. I'm suggesting that we simply don't know what happened. And if we don't know what happened, then summary judgment is inappropriate. And specifically this court doesn't have jurisdiction when the district court has said, we don't know what happened. So for the search of coffee wonk that happened later, the district court found that there's a dispute, a fact over whether Mr. Riggs consented to that search or whether he revoked any previous consent. And your honor was asking about the timeline for that search and how did it happen? And I think it's very important because the district court didn't find and the defendants never argued and they don't argue now that toy go had probable cause when he made his first observation. So toy go is there doing a robbery investigation. He goes behind the counter and he sees packets of incense and then he leaves. And toy go testified that his robbery investigation was over and that the incense was not part of the robbery investigation. He then left and called the drug enforcement unit and called officers, Acton and Taylor and Acton and Taylor arrive on the scene, do an investigation. They talked to Matt, Matt and the court finds that there's arguable probable cause at that point in time, they go back into the coffee wonk once again, after the initial search is over, there's no real suggestion that this search was ongoing. So your, your assertion is that it's two searches. Absolutely. Your honor. So is it in the record? Um, how many officers remained after toy go left and gathered this information? Are there still, is the record tell us whether there's still officers there that suggest it's a continuous search or whether the place is, uh, that everybody leaves and then everybody comes back again. Is that in the record? Um, I don't believe there's any indication in the record that there are officers that remained inside coffee wonk. There's certainly no officers that remain behind the counter. Uh, that much is in the record, but you know, if that's not in the record, I believe taking the facts, uh, and the light most favorable to Mr. Riggs, you would have to assume that there were no officers left inside the coffee wonk that they left. Is the record say how much time between the two and contested points? Uh, no, I don't believe the record indicates, uh, the amount of time, but what the record does indicate is the officers came back inside and they said, and this is Mr. Rick's testimony. It was in his affirmation or his affidavit. Uh, in our reply brief, uh, he says that the officers came back to the counter and they said, can we go back behind there and take all the evidence? Mr. Rick said, no, you can't come back here. You can't seize anything. Um, and that indicates that the consent was revoked prior to any seizure happening. The seizure didn't happen. And even if the officers, even if a search had been going on the time and continuing at the time, which it hadn't, he revoked that consent prior to them going back and seizing. Yeah. Counsel, how does that apply to officer Taylor? Well, officer Taylor was one of the officers who went behind the counter to search for the instance, but he was not part of the original robbery investigation. Was he correct? I think that's an important point. Your honor that. So the original robbery offer investigation was, I believe the original officer on the scene was an officer Hamill, but he's not really important to this. The officer who did the robbery investigation was detective Toyko. He came by himself, uh, and Taylor and Acton were not there yet. There was nobody from the drug enforcement unit at coffee wonk while that search was going on. That happened at a later point in time. By the time officer Taylor arrived, there were already officers behind the counter. So you have to look at the situation from his eyes. What did he see when he arrived? Your honor. That's not in the record. That is inaccurate. He does not see officers behind the counter. When he arrives, they arrive, he arrives with Acton. Toyko is gone. There's no officers behind the counter at the time. And then they asked Acton Taylor Toyko. They say, can we go behind the counter? Take your incense. Mr. Rick says, no. Um, and, uh, they go behind anyway. So there was nobody in Mr. This is Mr. Rick's testimony. There was nobody behind the counter at the time when they asked for a second search that had already happened early in the morning. It's unclear how much time had passed. Uh, that's not in the record, but there is a clear demarcation. I mean, Toyko testified that his search was complete. It was over. Uh, and none of the other officers had any indication that there was a robbery investigation, uh, that there was a previous consent, uh, that's not in the record at all. And, you know, it's defendants burden of proof to prove the predicate facts that we give rise to this. And I think it's important that we're discussing these hotly contested facts because the district court already decided this district court said, well, there's a question of fact about what happened and whether that consent was revoked. And the fact that we're going through the record and talking about this highlights the fact that this is not appealable. It's a genuine dispute of fact. Their brief just only disputes facts. They're opening brief. And the council admitted that it was poorly drafted. It was so poorly drafted that I couldn't form any sort of a response to the arguments that are in the reply brief. And so they've completely waived that they had no opportunity to reply to the arguments in the reply brief. So those arguments are waived finally with, uh, the search that happened approximately two years later, uh, at Coffee Wong with Gibbs, Onik, Whaley and Dumit. Um, there's a suggestion that this was a dual purpose administrative search, but the district court held that there's a genuine dispute of fact, whether it is in fact a dual purpose search or is merely a pretext or subterfuge for a criminal investigation. Um, the defendant and that's once again, not appealable questions of intent, which is what this is, what's the motivation of the officers behind performing the search. That's not an appealable final order. So this district court or the appellate court doesn't have jurisdiction, uh, to overturn that finding. Defendants suggest that there is no evidence in the record suggesting that this is a, a pretextual search, but that is simply not the case. There's a lot of evidence indicating that this was not an administrative search at all. Um, the original briefing for this search, two officers testified that there was no mention of a Tavern check. There was no mention of a liquor license. Nobody knew about it. So the reasonable inference when they say they don't remember it is that it didn't happen. There was no discussion of a Tavern check or a liquor license prior to performing the search. Um, multiple officers have said specifically said the purpose of the search was to look for K2. That's not the other purported, uh, justification, which was to go in and check for a liquor license, which coffee one did not have. Um, they constantly, the officers constantly refer to the search as a buy bust. Um, and Gibbs, this is important. Gibbs testified at deposition that if the buy portion of the buy bust hadn't gone through, if Whaley had been unable to purchase any alleged narcotics, they wouldn't have gone in and done the search. That's, that's a simple pretext. They weren't going to go in and do a liquor license check unless they found evidence of a crime. He also said that, uh, if there hadn't been a liquor license, he would have done the same thing. The liquor license is just a complete subterfuge. There's no real indication. There's no evidence that there was actually an administrative search aside from Gibbs saying that it was, that's the only evidence there is. The police report that Gibbs filed afterwards doesn't mention it being a tavern check. He says there's a liquor license and that he received a complaint, but he doesn't mention it being a tavern check. He doesn't mention looking for liquor license. He simply says they went in, they searched for the drugs, and then they left. Um, Gibbs testified in his deposition about what a normal tavern check would have entailed. He said that there would be a liquor check form and it'd be logged in a weekly activity sheet of tavern checks. Those two things didn't happen. There's no liquor check form. There's no weekly activity sheet saying that he, uh, did a tavern check at comfy walk. Any questions about that search? Well, and, and once again, the district court found that all of that created a genuine dispute of fact, uh, with respect to whether it was truly a dual purpose search or not. And this court, once again, doesn't have jurisdiction, uh, to change that finding. Uh, the last point I want to make is that, um, no, there's two more points that I want to make. One is that the district court also found that there's a, uh, the mistaken belief that coffee won't had a liquor license. May in fact not be reasonable because when, uh, Gibbs walked into the coffee wonk, he said, he testified that he realized that there was syrup bottles, no liquor being sold. He didn't see any liquor licenses. So at some point in time, that belief does become unreasonable. And the belief that there's a liquor license there becomes unreasonable. And there's no reason to believe that he could perform a liquor check there. Um, defendants seem to suggest that there's not a single set of circumstances that could change whether that's a reasonable. And that's not the case. At some point in time, that, that belief just simply becomes unreasonable. No reasonable person walks into a Starbucks and orders a whiskey. And the court held that that is a question of fact for the jury. So whether that mistake of fact was reasonable and whether Gibbs actually believed actually had a mistaken belief, uh, about the state of the liquor license is, uh, not reviewable by this court. It's a question for the jury. And the final point I want to make is with respect to, uh, defendants, Onik and Whaley, uh, Gibbs was the one Gibbs and Dumit received the email from regulated industries talking about the, uh, liquor license. So Onik and Whaley, they don't have any reasonable belief about there being a liquor license at all, because they didn't have that information. They testified that the briefing, they didn't receive that information. So in their eyes, they're just going in and performing a search, uh, without a, uh, warrant. I see. I'm running low on time. So if your honors have any questions, Hearing none. Thank you, Mr. Bell. Thank you. How much time does Ms. Blake have? Blake has one minute and six seconds. Very well. Uh, on the last, I'll start with the last point he made. Um, if Whaley is under the direction of officers who did know it was a tavern check, not briefed on it, doesn't make it not a tavern check. Um, he says that we argue it's, uh, no evidence of pretext. He never said that there was no evidence. What we said was that there was a dual purpose search. It's a separate liquor license violation to sell drugs at your premises. He turned out to be selling drugs. He had a history of selling drugs there. And when they found that, uh, there, that was part of a lawful administrative search. There's nothing in the administrative search exception that requires specific forms or things to be reported on. So long as they had a valid basis under law to do the administrative search. And here it is a valid reason under the Kansas city ordinances to go into a licensed premise and see if they're selling law, uh, drugs in violation that could cause them to revoke their license. Because that basis exists. That was a lawful reason to do a tavern check, even if they had subsistence suspicion of drugs, because that's often how administrative searches work. There's discretion, whether to do administrative search or not. And if they think that their purpose of the administrative search is met, even if that's the same purpose as a criminal search, that's plainly lawful. And that's the case in thousands of first amendment fourth amendment cases. Um, as to, uh, the many of the other points, I think that the record will simply speak for itself as to how much of this is assertion by council and how much of it is actually borne out by the, uh, facts found by the district court and that were actually found in the different situations. Very well. Thank you, Ms. Blake court appreciates your arguments today. Case is submitted and will be decided in due course.